H. Dale SEAMONS, Plaintiff—Appellee,

v.

STRUCTURAL DYNAMICS RESEARCH CORPORATION, Defendant—Appellant.

No. 00–15718.

D.C. CV–97–20955–PVT.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 12, 2001.

Decided Dec. 6, 2001.

---

Before PREGERSON, RAWLINSON, Circuit Judges, and WEINER, District Judge [1].

### MEMORANDUM [2]

Structural Dynamics Research Corporation (SDRC) appeals from the district court's judgment in favor of H. Dale Seamons awarding Seamons $157,682.85 in damages and $67,664.86 in prejudgment interest. The award arose out of a dispute over whether Seamons was entitled to credit toward his sales quota for the value of an option exercised by the Boeing Company to purchase the appellant's "PDM" software. The district court had jurisdiction over the action pursuant to 28 U.S.C. § 1332. This court has jurisdiction over

the appeal pursuant to 28 U.S.C. § 1291. We affirm.

The facts are well known to the parties and will be repeated here only to the extent necessary to explain our holding. In its decision, the district court took two different tracks in analyzing whether Seamons was entitled to the quota credits. First, the court found that the 1995 agreement was ambiguous on its face as to whether Seamons was entitled to quota credit for PDM sales that, like the Boeing option, constituted so-called "Mega Deals." The district court went on to find that the evidence of the parties' respective intent in entering into the agreement failed to resolve the uncertainty as to whether SDRC was obligated to give Seamons quota credit for the Boeing sale. Second, the court undertook to analyze the case on the basis of whether Seamons had earned the right to the commission and quota credit before he signed his 1995 compensation agreement and, whether by signing the 1995 agreement, he forfeited that right. It concluded that the date Seamons earned the quota credit on Boeing's exercise of its option related back to the date the option was granted. It then concluded that the agreement failed to clearly and unambiguously state that Seamons forfeited his prior earned quota credits by entering into the 1995 agreement. Although we find the district court was incorrect in its initial determination that the 1995 contract was ambiguous, that error was harmless.

On its face, an ambiguity seems to arise from the two consecutive, inconsistent sentences in the employment agreement setting forth the quota credit term. However, when the employment contract and the

1. Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2. This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by 9th Cir. R. 36–3.

Mega Deals rider are considered together, we do not believe there is an actually inconsistency. In the first sentence, the agreement makes a clear recital that Seamons will receive commission and quota credit of $.50 on the dollar for PDM sales in excess of $2.5 million. The next sentence, however, provides that "all commission rates" are subject to the Mega Deal rules, which, inter alia provide that quota credit is not available to certain employees on sales which constitute Mega Deals. While the second sentence might appear to create a question concerning whether the Mega Deals rider supercedes the recital contained in the first sentence, the plain meaning of the words used by SDRC in the second sentence indicates that the terms of the rider applied only to *commission rates* and not to *quota credits.* Of equal import, Seamons was not one of the employees to whom the quota credit term of the rider even applied.

Where the company intended that different rules apply to quota credits than to commission rates it made them clear in other parts of the employment agreement. For example, the agreement recites seven instances where an employee will not receive quota credits even though commissions are paid. Most tellingly, the same provision in the Mega Deals rider that sets out that quota credit is not available for Mega Deals limits the reach of that provisions to sales of PDM products or services "when sold in the territory of an Account Manager, Branch Manager, Account Executive or Senior Branch Manager." As Seamons was a District Manager, this provision of the rider did not apply to him.

Given this, we also find there was no ambiguity or contradiction between the Mega Deals rider providing that "[quota] credit is not applicable" and the provision in Seamons' compensation agreement that he would receive quota credit of $.50 on the dollar above $2.5 million. As Seamons was a District Manager, the rider did not apply to him even if it were a part of his compensation agreement. If SDRC intended that the Mega Deals rider apply to quota credits as well as commission rates, it should have included those words in the second sentence; if it intended the rider to apply to District Managers, it should have included them in the list of employees to whom the Mega Deals rider applied. Since it did not, the contract must be construed against it. See generally, Cal. Civ.Code § 1654 ("In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who cause the uncertainty to exist.").

Since we conclude that Seamons' quota credits were not affected by the Mega Deals rider, the district court's initial conclusion that the employment agreement was ambiguous was harmless error.

AFFIRMED.

Judge RAWLINSON, concurring.

I concur in the result.